

ISSUED TO ATTORNEY

FILED

00 OCT 13  PM 4: 04

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO, WESTERN DIVISION

MUNIR M. UWAYDAH, M.D.
927 NORTH MALCOM STREET
APARTMENT 12C
MONROE, MICHIGAN 48161

       Plaintiff,

       v.

VAN WERT COUNTY HOSPITAL
1250 SOUTH WASHINGTON STREET
VAN WERT, OHIO 45891

       and

MARK J. MINICK
1250 SOUTH WASHINGTON STREET
VAN WERT, OHIO 45891

       Defendants.

Case No. **3: 00CV7640**

JUDGE JUDGE JAMES G. CARR

**COMPLAINT**

**JURY DEMAND
ENDORSED HEREON**

For his Complaint against the Defendants, Plaintiff states as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action seeking relief from the Defendants' defamatory acts, tortious interference with business relationships and contract, and reckless, malicious and outrageous conduct.  Defendants recruited Plaintiff to provide medical services to patients at Van Wert County Hospital ("Hospital").  Defendants enticed Plaintiff to relocate to Van Wert, Ohio with promises that they did not intend to keep.  After the Defendants' misconduct ended the business relationship with the Plaintiff, the Defendants embarked upon a series of outrageous and malicious acts intended to prevent the Plaintiff from gaining and/or maintaining a business relationship.  The Defendants knowingly published oral and written defamatory statements concerning the Plaintiff to third parties with whom the Plaintiff was attempting to establish and maintain business and contractual relationships.  Upon information and belief, Defendants are continuing to engage in a malicious campaign against the Plaintiff.  The Defendants' defamatory statements subjected the Plaintiff to the potential for public hatred, contempt, ridicule, shame, and disgrace.  The Defendants' defamatory statements injured the Plaintiff's reputation and adversely affected his professional practice of medicine.  The Defendants' defamatory statements and conduct interfered with the Plaintiff's contractual and business relationships with The Medical College Hospital ("MCO"), Associated Physicians of MCO ("APMCO"), The Cleveland Clinic ("CCF") and Paulding County Hospital ("PCH").  The Defendants' actions have caused and continue to cause Plaintiff to suffer economic damage, damage to his reputation, emotional injury and other damage.

2.    Plaintiff also brings this action under 42 U.S.C. § 1983 for the Defendants' discriminatory actions against the Plaintiff, which were made under the color of state law.

Plaintiff, a Lebanese citizen, was discriminated against on the basis of his national origin. Defendant Hospital is a county operated and funded facility and Defendant Minick is an agent of the Hospital. Defendants conspired to discriminate against the Plaintiff depriving him of his rights, privileges, and immunities.

3.     Plaintiff also brings this action under 42 U.S.C. § 2000e et seq. for the Defendants' discriminatory actions in discharging and discriminating against Plaintiff on the basis of his national origin. The Defendants' discriminatory acts further interfered with Plaintiff's attempts to gain access to privileges at other institutions.

## **JURISDICTION**

4.     This Court has jurisdiction over the conduct complained of herein for all of the following reasons:

> (a) This Complaint states federal causes of action under 42 U.S.C. § 1983 and 42 U.S.C. § 2000e et seq.

> (b) This Complaint is, in part, between residents of different states;

> (c) The amount in controversy exceeds $ 75,000;

> (d) The Defendants reside in this state;

> (e) Defendants have purposely availed themselves of this forum by engaging in the practices described herein in this state and within this Court's jurisdiction, such that the Defendants could reasonably anticipate being hailed into court in this state; and

> (f) Defendants regularly transact business within this state and receive substantial revenue from services provided within this state.

## **THE PARTIES**

5.     Plaintiff Munir Uwaydah, M.D., ("Dr. Uwaydah") is a resident of Monroe, Michigan. Dr. Uwaydah was born in the United States and has dual citizenship in both the

United States and Lebanon. Dr. Uwaydah is a practicing physician, licensed to practice medicine in Ohio, Michigan, California and Florida. Dr. Uwaydah received his medical doctorate from American University in Beirut, where he also trained in general surgery. Dr. Uwaydah was accepted as a first year resident in general surgery at New York University Medical Center, followed by a four year Harvard Combined Orthopedic Surgery Residency Program and Albert Einstein Medical College at Bronx-Lebanon Hospital Center Orthopedic Surgery Program. After completing his residency, Dr. Uwaydah undertook an Orthopedic Surgery Fellowship at Stanford University Medical Center and a Spine Fellowship with Dr. Glen O'Sullivan who is now in Ashland, Oregon.

6.      Defendant Mark J. Minick ("Minick") is a resident of Ohio. Minick is the President of Van Wert County Hospital. At all times pertinent to this litigation, Minick has had actual, apparent, implied and constructive authority to act on behalf of Van Wert County Hospital. Minick engaged in the conduct complained of herein by himself and through his agents and employees. Minick controlled the acts of his employees and agents.

7.      Defendant Van Wert County Hospital ("Hospital") is an Ohio not-for-profit corporation with its principal offices in Van Wert County, Ohio. The Hospital is engaged in the business of providing medical services in the state of Ohio. The Hospital regularly provides medical care for residents of Ohio. The Hospital engaged Dr. Uwaydah to provide medical services at the Hospital's location in Van Wert, Ohio. The Hospital impliedly, constructively and expressly authorized Minick and others to commit the acts complained of herein.

## PLAINTIFF'S EMPLOYMENT HISTORY
## AND DEFENDANTS' ILLEGAL CONDUCT

8.    Prior to February 1999, Minick began recruiting Dr. Uwaydah to work as an orthopedic surgeon at the Hospital.  During the recruiting, Minick made promises to Dr. Uwaydah on behalf of the Hospital.  Minick had actual, apparent, implied and constructive authority to make the promises to Dr. Uwaydah on behalf of the Hospital.  Neither Minick nor the Hospital intended to fulfill these promises.  The Hospital and Minick misrepresented that Dr. Uwaydah would be the only orthopedic surgeon on the Hospital's PPO list.  However, the Hospital and Minick subsequently appointed numerous other orthopedic surgeons.  Moreover, one of the orthopedic surgeons appointed, Dr. Muha, was a hand surgeon.  Dr. Uwaydah made it known to the County Hospital that he intended to undertake a three-month hand fellowship upon the representation that he would be the only hand surgeon at the Hospital.  In March 1998, Dr. Uwaydah advised Minick that he had decided to terminate the Medical Services Contract ("Contract") dated October 21, 1997.

9.    As a result of Dr. Uwaydah's March 1998 termination, the Hospital and Dr. Uwaydah renegotiated the Contract.  In consideration for the Hospital's promises during renegotiations, Dr. Uwaydah agreed to an additional year at the Hospital.  The renegotiated Contract also contained an arbitration provision requiring disputes to be submitted to confidential arbitration.  On March 31, 1998, Holly Troxell, ("Troxell") Vice President, Physician and Community Services, of the Hospital, advised Dr. Uwaydah that the Hospital was prepared to proceed and would "begin applying for your provider numbers so that you may bill for procedures as quickly as possible."

10.     In July 1998, Minick wrote Dr. Uwaydah "a note regarding the progress of some of the initiatives that we are undertaking in the marketplace to gain market share [sic] for your practice." Minick advised of an Ambulatory Surgery Center ("ASC") that would "allow us to exclusively credential physicians who will be doing procedures within this facility." Minick explained that the ASC would allow "us the ability to channel market share [sic] under this exclusivity." Minick falsely represented that "investment options, will be available to physicians who wish to participate in the ASC operations." Minick also confirmed that the Hospital would provide call coverage for Dr. Uwaydah and address other "quality of life issues". Minick stated that the Hospital had been working on "a variety of initiatives that we feel will make your practice very successful on a rapid-track approach." At the time he made the representations regarding the ASC, market share, exclusive credentialing, investment options, quality of life issues and helping Dr. Uwaydah establish a successful practice, Minick knew neither he nor the Hospital intended to fulfill these promises. Minick and the Hospital also knew that Dr. Uwaydah was entering into the Contract with the Hospital under the mistaken belief that the Defendants' promises were material terms of the Contract.

11.     On September 25, 1998, Dr. Uwaydah arrived in Van Wert, Ohio and entered into a six-month lease of a home. However, Dr. Uwaydah was unable to immediately begin practicing in Ohio. Licensing and billing delays directly and indirectly caused by the Hospital delayed the start of Dr. Uwaydah's practice. During the delay, Dr. Uwaydah returned to San Francisco to complete a previously commenced spine fellowship. Completion of the spine fellowship would benefit the Hospital and it would help distinguish him from the other orthopedic surgeons. Dr. Uwaydah could resign from the fellowship at any time and he intended to do so as soon as his practice in Van Wert was established.

12.     Dr. Uwaydah learned shortly after relocating that the two other orthopedic surgeons that the Hospital represented would be leaving the Hospital had thriving practices and no intention of leaving.  On October 21, 1998, Dr. Uwaydah informed Troxell of this and other troubling incidents that had occurred since the inception of his relationship with the Hospital. Prior to signing the Contract with the Hospital, it was represented to Dr. Uwaydah that he would be the only orthopedic surgeon on the PPO list.  Troxell had repeatedly reaffirmed that the Hospital was committed to having him as their only surgeon and they would do whatever it takes to ensure that he was the exclusive orthopedic surgeon on the Hospital's PPO List.  However, as of October 1998, the Hospital still had not begun to fulfill this obligation.

13.     The Defendants had no intention of making Dr. Uwaydah the exclusive orthopedic surgeon on the Hospital's PPO list.  The Defendants also knew that Dr. Uwaydah entered into the Contract with the Defendants under the mistaken belief that the Hospital intended to make him the exclusive surgeon on the Hospital's PPO list and that it was a material term of the Contract.

14.     In October 1998, Dr. Uwaydah advised the Hospital that their delay in providing a letter memorializing their representations to him had caused delay in his application for an Ohio state license.  Dr. Uwaydah did not want to incur the significant expense of applying for an Ohio state license unless the Hospital was committed to honoring its representations.  In addition to significant time input, the application process requires hiring a specialized company to aid in completing the exhaustive information and materials required to apply for an Ohio state medical license.  After Dr. Uwaydah had already determined to take a leap of faith, and begin the licensing process, the Hospital advised him that they would not honor their promise to remove the other orthopedic surgeons from the Hospital's PPO List.

7

15.     On February 9, 1999, Dr. Uwaydah's practice at the Hospital started in a disorganized and disconcerting manner. The Defendants' immediately began interfering with Dr. Uwaydah's ability to render orthopedic surgical care for his patients. The Defendants limited Dr. Uwaydah's time in the operating room. At the Hospital's recommendation, Dr. Uwaydah signed a one-year contract with a practice management group. However, the practice management company that the Hospital recommended turned out to be "grossly incompetent." Dr. Uwaydah's start time was delayed by the practice company's failure to file for a tax identification number. The Hospital's person who was in charge of filling out and filing various provider applications also failed to file applications and/or filed incomplete applications for provider numbers. Dr. Uwaydah's Medicare application was incomplete and other insurance companies did not even have Dr. Uwaydah's application. The Medic Billing System that Dr. Uwaydah purchased from the Hospital turned out to be defective. Dr. Uwaydah expended considerable time and money putting the system into working order. Moreover, the Hospital withdrew its promise to provide Dr. Uwaydah with an equity ownership in the ASC. Dr. Uwaydah's equity ownership in the ASC was a material term of the Contract and Dr. Uwaydah entered into the Contract with the Hospital under the mistaken belief that the Hospital would honor its promise to give Dr. Uwaydah an equity ownership in the ASC.

16.     By August 1999, Dr. Uwaydah was having difficulty securing sufficient operating room time to properly care for his patients. While recruiting Dr. Uwaydah, the Hospital represented that there were three fully functional operating rooms and two additional rooms would be added in the medical office building by September 1999. However, as of August 1999, Dr. Uwaydah advised the Hospital of the "uphill" battle securing operating room time to perform his cases in a timely fashion. Dr. Uwaydah was not getting the three and a half

days of operating room time per week that was necessary to properly care for his patients. Moreover, delays were about to increase. The Hospital had credentialed another orthopedic surgeon and was considering yet another orthopedic spine surgeon.

17.     Even though the Hospital was increasing the number of orthopedic surgeons, Dr. Uwaydah found it increasingly difficult to get coverage for his patients or the emergency room when he was not available. In his July 9, 1998 letter, Minick stated, "we will have to provide for proper call coverage and other quality of life issues you may have." The Hospital also acknowledged, "We all realize having an associate in your practice may provide the best coverage for our patients and you." Nonetheless, the Hospital failed to provide the proper call coverage and thwarted Dr. Uwaydah's efforts to hire another orthopedic surgeon for his office. After great effort, Dr. Uwaydah recruited Dr. Juhasz as a candidate to join his practice. Despite Dr. Juhasz's qualifications, the Hospital rejected her because of her sexual preference.

18.     In October 1999, Dr. Uwaydah was provided a draft of the Hospital's proposed lease of office space for Dr. Uwaydah's practice in the Hospital's new medical office building ("MOB"). Notably absent from the proposed lease was any reference to a promised membership in Van Wert MOB One, Ltd ("Van Wert MOB") - - the practice that the Hospital was establishing at the new office building. The Hospital had promised Dr. Uwaydah an ownership interest in Van Wert MOB. After first concealing their true intentions, Minick later admitted that the Hospital did not intend to provide Dr. Uwaydah an ownership interest in Van Wert MOB. On January 12, 2000, the Hospital admitted that it did not intend to honor its promise of membership in Van Wert MOB.

19.     On December 10, 1999, counsel for the Hospital sent Dr. Uwaydah a letter alleging that he had materially breached the Contract with the Hospital and demanding full

9

access to his financial records and those of his practice - - Van Wert Orthopedics & Spine Surgery, Inc.  The alleged breach included "taking time off from your practice well in excess of the time allowed under the [medical services] contract."  Not only did Dr. Uwaydah deny the alleged breach, some of the alleged breaches were not a breach by the terms of the Contract.  For example, there was no limit on the amount of time off Dr. Uwaydah could take.  The Contract expressly stated that taking time off from the practice "will not be considered a breach of contract." The Hospital also inaccurately alleged that Dr. Uwaydah breached the Contract by failing to reimburse the Hospital for monies owed to the Hospital under the Contract.

20.    In December 1999, DR Management, a contractor for the Hospital, obtained a computer password for Dr. Uwaydah's practice without his authorization or knowledge.  DR Management used the password to change a privilege level for at least one of Dr. Uwaydah's employees and gain access to all of Dr. Uwaydah's confidential patient information.  DR Management did not have Dr. Uwaydah's permission to access his computer system.

21.    In February 2000, Dr. Uwaydah learned that Dr. Sanko had recommended that the Hospital limit the number of spine cases done by Dr. Uwaydah.  Dr. Sanko impliedly recommended that the Hospital limit the number of spine cases because it would limit the number of Medicare patients and increase the number of private pay patients.  A substantial number of spine surgeries are Medicare insured patients.  Dr. Sanko's recommendation would further delay surgeries for Dr. Uwaydah's Medicare patients.  Dr. Uwaydah requested an inquiry into the recommendation of Dr. Sanko.  The Hospital did not investigate.  Instead, the Hospital accepted Dr. Sanko's recommendation and limited the number of spine surgeries to two (2) spine surgeries per week.  This was approximately a 66% reduction in the number of spine surgeries

Dr. Uwaydah could perform. The new schedule was devastating. The majority of Dr. Uwaydah's spine surgeries were from referrals from physicians outside the community. If these physicians or their patients were forced to wait more than the two months they were already waiting, the referrals would cease.

22. The Hospital effectively terminated the Contract with Dr. Uwaydah. The Defendants filed a complaint in Van Wert County Court of Common Pleas. The Defendants alleged that Dr. Uwaydah breached the contract with the Hospital, hid assets, failed to provide the Defendants with an accounting of his receipts and receivables and took too much time away from the practice at the Hospital. The Defendants breached their Contract with Dr. Uwaydah by going to court rather than arbitrating their dispute with Dr. Uwaydah. The Contract expressly required that the Defendants submit disputes relating to the Contract to a confidential arbitration process.

23. The Defendants maliciously filed a complaint in court to publicly humiliate and defame Dr. Uwaydah. The Defendants abused the legal process. The Defendants defamed Dr. Uwaydah in a complaint that never should have been filed. The Defendants used the privilege that goes with legal proceedings to defame Dr. Uwaydah with false allegations maliciously submitted for public viewing in Dr. Uwaydah's hometown.

24. The Defendants, particularly Defendant Minick, incorrectly believed that the privileges afforded by the legal process also protected them from defamation charges for defamatory statements made to third parties not connected to the litigation process. Defendants believed that by putting their false and defamatory statements in the public record they could simply assert that their defamatory statements made to third parties were a matter of public

record. The Defendants also violated Dr. Uwaydah's privilege of peer review that protected Dr. Uwaydah from disclosure of any information obtained in the peer review process.

25.     The Hospital sought to ensure that Dr. Uwaydah would not obtain other employment. The Defendants made defamatory remarks concerning Dr. Uwaydah to MCO, APMCO, CCF and PCH. The Hospital and Minick defamed Dr. Uwaydah in his efforts to obtain privileges at MCO. Minick made special effort to contact the director of the medical staff and President of MCO and make defamatory remarks about Dr. Uwaydah. Minick falsely represented that Dr. Uwaydah was not properly credentialed to practice medicine, and falsified his credentials, among other remarks. Minick's remarks were not true and he either knew it or acted with reckless disregard for the truth. Minick's remarks prevented Dr. Uwaydah from obtaining full privileges at MCO.

26.     The Defendants also made defamatory statements to CCF. Dr. Uwaydah and CCF were discussing possible employment alternatives. Dr. Uwaydah began investigating the possibility of employment by CCF after the Defendants interfered with Dr. Uwaydah's attempts to obtain employment at MCO. As Dr. Uwaydah and CCF were ready to begin their contractual relationship, the Defendants again interfered with the contract and/or business between Dr. Uwaydah and CCF. As a result of the Defendants' interference and defamatory statements, CCF determined not to have any further contractual or business relationship with Dr. Uwaydah.

27.     The Defendants continue to defame Dr. Uwaydah with false and malicious statements directed to any entity or person. Dr. Uwaydah attempts to engage in a contractual or business relationship. Without a temporary and permanent order enjoining the Defendants from making defamatory statements, Dr. Uwaydah will suffer irreparable harm due to the Defendants'

acts.  The Defendants, particularly Defendant Minick, have demonstrated a malicious desire to destroy any business or contractual relationship Dr. Uwaydah attempts to establish.  Defendant Minick has relentlessly engaged in a repeated course of conduct causing irreparable harm to Dr. Uwaydah by false, malicious, defamatory statements regarding Dr. Uwaydah's employment history, credentials to practice medicine and character.

## COUNT ONE
## SLANDER, LIBEL AND DEFAMATION

28.     All averments set forth above are hereby incorporated as if fully restated herein.

29.     The Defendants falsely represented to third parties that Dr. Uwaydah may have falsified his credentials to practice medicine.  The Defendants' libel communicated defamatory statements about Dr. Uwaydah in written communications to MCO.  The Defendants' slander included oral statements by Defendant Minick, acting on behalf of the Hospital, that falsely represented that Dr. Uwaydah was not in good standing with the medical staff.

30.     The Defendants' oral and written communications to MCO, APMCO, CCF and PCH were false, defamatory and not privileged.  The Defendants' publications were:

(a)     Negligent, intentional and malicious;

(b)     Made in an unreasonable manner and for an improper purpose;

(c)     Did not concern a matter in which the Defendants and MCO, APMCO , CCF or PCH shared a common interest;

(d)     Did not arise out of Dr. Uwaydah's employment by the Defendants; and,

(e)     Were made with actual malice.  The Defendants knew their statements were false and made with reckless disregard of the truth or falsity.  The Defendants' statements were motivated by anger,

hatred and ill will and with reckless disregard of the consequences and rights of Dr. Uwaydah.

31.     As a result of Defendants' slander, libel and defamation, and upon information and belief, Dr. Uwaydah has been exposed to public hatred, contempt, ridicule, shame, disgrace and subjected to injury to his public reputation as well as affected adversely in his professional practice of medicine.  Dr. Uwaydah has suffered and will continue to suffer actual damages.

## COUNT TWO
## TORTIOUS INTERFERENCE WITH CONTRACT

32.     All averments set forth above are hereby incorporated as if fully restated herein.

33.     Through the acts complained of herein, Defendants have tortiously interfered with Dr. Uwaydah's business and contractual relationship with MCO, APMCO, CCF and PCH.   Defendants had knowledge of the business and contractual relationships and privileges enjoyed by Dr. Uwaydah.  Defendants intentionally interfered with Dr. Uwaydah's relationships by communicating defamatory information to members of the credentialing and executive committees, among others.  The Defendants knowingly, intentionally, recklessly and/or maliciously interfered with the contractual relationship between Dr. Uwaydah, MCO, APMCO, CCF and PCH.

34.     The Defendants' interference with Dr. Uwaydah's contractual relationships was without justification.  As a direct result of the Defendants' interference with Dr. Uwaydah's relationship with MCO, APMCO, CCF and PCH, Dr. Uwaydah has suffered substantial damages.  Dr. Uwaydah has lost the opportunities provided by his patients, MCO,

APMCO, CCF and PCH to perform surgery.  Dr. Uwaydah has also suffered damage to his personal and professional reputation.

## COUNT THREE
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

35.    All averments set forth above are hereby incorporated as if fully restated herein.

36.    The Defendants interfered with Dr. Uwaydah's business relationships with MCO, APMCO, CCF and PCH.  Dr. Uwaydah, MCO, APMCO, CCF and PCH established business relationships.  The Defendants' knew of Dr. Uwaydah's business relationships with MCO, APMCO, CCF and PCH.  The Defendants falsely represented that Dr. Uwaydah was not properly credentialed and/or had falsified his credentials and/or was not in good standing with the Hospital, among other allegations.  The Defendants' false representations interfered with Dr. Uwaydah's business relationships with MCO, APMCO, CCF and PCH. The Defendants' interference with Dr. Uwaydah's business relationships with MCO, APMCO, CCF and PCH was unjustified.  Dr. Uwaydah was well credentialed to provide orthopedic medical care, did not falsify his credentials and was in good standing.  At no time, either during the period of his appointment or since his departure, was he the subject of any formal or informal peer review proceedings.

37.    As a result of the Defendants' interference, MCO did not grant Dr. Uwaydah full privileges.  Dr. Uwaydah's relationships with APMCO, CCF and PCH were also harmed.  Dr. Uwaydah has been and continues to be damaged by the Defendants' interference with his business relationships.  The conduct of Defendants caused and continues to cause Dr.

Uwaydah to incur financial loss and suffer immeasurable damage to his personal and professional reputation.

## COUNT FOUR
## FRAUD, FRAUDULENT CONCEALMENT AND DECEIT

38.     All averments set forth above are hereby incorporated as if fully restated herein.

39.     The Defendants made numerous material misrepresentations and failed to disclose material information to Dr. Uwaydah. The Defendants fraudulently represented that Dr. Uwaydah would receive proper administrative support, sufficient operating room time and an ownership interest in the ASC. The Defendants concealed their true intentions. At the time that these representations were made, the Defendants knew that Dr. Uwaydah needed the true facts to decide whether to accept the position at the Hospital.

40.     The Defendants' statements, representations and/or omissions were both material and false. There was a substantial likelihood that a reasonable prospective employee would have considered them important in deciding whether or not to accept an offer of employment from the Defendants.

41.     The representations and omissions on which Dr. Uwaydah relied were not true, and the Defendants did not believe them to be true when made. The Defendants acted with reckless indifference to the truth and the rights of Dr. Uwaydah.

42.     Dr. Uwaydah did not know that the Defendants' statements were false and that the Defendants had not disclosed material information. In actual and justifiable reliance on the Defendants' omissions and misrepresentations of material fact, and in ignorance of the true facts, Dr. Uwaydah was induced to accept the offer of employment from the Defendants. By

16

reason of the foregoing, Dr. Uwaydah has been harmed and is entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

**COUNT FIVE**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

43.     All averments set forth above are hereby incorporated as if fully restated herein.

44.     The Defendants had an implied contractual duty to act in good faith and deal fairly with Dr. Uwaydah.  A duty to act with good faith and deal fairly is implied in every contract.  The implied duty of good faith and fair dealing applied to the relationship between the Defendants and Dr. Uwaydah as a result of their contractual relationship.  The Defendants breached their duty of good faith and fair dealing by failing to even attempt to uphold their duties under the Contract with Dr. Uwaydah.  The Defendants acted in bad faith by filing a complaint in court.  The Contract with Dr. Uwaydah clearly required arbitration of the dispute that the Defendants alleged in the Van Wert County Common Pleas Court.  The Defendants acted in bad faith by recommending incompetent third party billing and collection groups to Dr. Uwaydah and then suing him for breach of the Contract, in part, on the basis of the inadequate services provided by the groups that the Defendants recommended.  The Defendants acted in bad faith by suing under the Contract when Dr. Uwaydah had not breached the terms of the Contract.  The Defendants' lawsuit was a bad faith attempt to extort from Dr. Uwaydah funds that were not due to the Defendants under the Contract between the parties.

45.     As a result of the Defendants' breach of the duty of good faith and fair dealing, Dr. Uwaydah has been harmed and is entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

## COUNT SIX
## FRAUDULENT INDUCEMENT

46.     All averments set forth above are hereby incorporated as if fully restated herein.

47.     The Defendants fraudulently induced Dr. Uwaydah to enter into the Contract with the Defendants by making numerous misrepresentations and nondisclosures in pre-contract negotiations and in the Contract itself. The misrepresentations and contractual language used by the Defendants to sell Dr. Uwaydah on the Contract intentionally omitted and concealed material facts and misrepresented the essential nature and material benefits of the Contract that the Defendants were proposing, rendering the Defendants liable to Dr. Uwaydah for fraudulent inducement.

48.     At the time that the Defendants made the representations and omissions of fact, complained of herein, they knew such representations were false, or made them in reckless disregard for their falsity or truth, and knew or should have known that material information was not disclosed to Dr. Uwaydah.

49.     As the Defendants intended and expected, Dr. Uwaydah reasonably relied upon the Defendants' representations and omissions in deciding to come to Van Wert and enter into a Contract with the Defendants. Dr. Uwaydah was unaware of the Defendants' material misrepresentations and nondisclosures, and could not have discovered them through reasonable diligence as a result of the Defendants' conduct as described more fully in this Complaint.

50.     The Defendants intended for Dr. Uwaydah to rely on the foregoing misrepresentations and omissions of fact, and intended to induce him to enter into the Contract and relocate his practice, as set forth throughout this Complaint.

51.     By reason of the foregoing, Dr. Uwaydah has been harmed and is entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

### COUNT SEVEN
### MISREPRESENTATION

52.     All averments set forth above are hereby incorporated as if fully restated herein.

53.     The Defendants made numerous material misrepresentations to Dr. Uwaydah during the pre-contract negotiations, in the Contract itself and during the performance of the Contract by Dr. Uwaydah.   At the time these misrepresentations were made, the Defendants knew that Dr. Uwaydah required the information misrepresented to decide whether to relocate his practice, enter into the Contract for his services, determine if the Defendants were properly performing their duties from the Contract and know what his duties were pursuant to the Contract.

54.     When the Defendants made their misstatements and misrepresentations, they were both material and false.  Dr. Uwaydah did not know the statements were false and reasonably believed them to be true.   In actual and justifiable reliance on the Defendants' omissions and misrepresentations of material fact, and in ignorance of the true facts, Dr. Uwaydah was induced to enter into the Contract and continue performing pursuant to the Contract even though the Defendants were breaching the Contract.

55.     Dr. Uwaydah was the foreseeable recipient of the Defendants' negligent and false statements, inasmuch as the Defendants specifically targeted their misrepresentations to Dr. Uwaydah regardless of who actually conveyed the information misrepresented.

56.     Based on the Defendants' relationship with Dr. Uwaydah, the Defendants owed to Dr. Uwaydah a duty to act with reasonable skill and diligence in conducting their business and a duty to ensure that the information they imparted to Dr. Uwaydah was delivered accurately and correctly.  As set forth herein, the Defendants breached these duties.

57.     By reason of the foregoing, Dr. Uwaydah has been harmed and is entitled to an award of compensatory and punitive damages in an amount to be determined at the trial of this action.

**COUNT EIGHT**
**REFORMATION**

58.     All averments set forth above are hereby incorporated as if fully restated herein.

59.     As alleged herein, the Defendants promised Dr. Uwaydah that he would receive the assistance necessary to make his practice at the Hospital successful, preferential treatment among orthopedic surgeons at the Hospital, placement on the Hospital's preferred provider list, an ownership interest in the ASC, Van Wert MOB, and other remuneration that the Defendants failed to deliver.

60.     The Contract that was delivered to Dr. Uwaydah by the Defendants after the Contract had already been entered into and partially and/or fully performed did not contain contractual provisions setting forth the parties' agreements, as alleged above.

61.     As alleged herein, Dr. Uwaydah procured the Contract from the Defendants as a result of the Defendants' promises, fraudulent and negligent misrepresentations, fraudulent involvement, fraudulent concealment and constructive fraud.  In addition, to the extent there are any differences between the respective expectations and understanding of the parties,

these differences are the result of a mutual mistake of fact. Finally, the reasonable expectations of Dr. Uwaydah concerning the Contract are not set forth in the Contract.

62. As a result of the foregoing, Dr. Uwaydah is entitled to equitable reformation of the Contract, to provide for the respective rights and duties agreed to by the parties.

**COUNT NINE**
**UNILATERAL MISTAKE**

63. All averments set forth above are hereby incorporated as if fully restated herein.

64. The Contract between Dr. Uwaydah and the Defendants was entered into based in whole or in part upon Dr. Uwaydah's mistaken beliefs of facts. Dr. Uwaydah mistakenly believed:

(a) That "investment options will be available to physicians who wish to participate in the ASC operations";

(b) He would receive adequate administrative assistance from the Defendants;

(c) He would be the Defendants' preferred provider of orthopedic surgery at the Hospital;

(d) The Defendants would follow the terms of the Contract between the parties;

(e) He would be the only orthopedic surgeon on the Hospital's PPO list;

(f) The Defendants would "begin applying for... [his] provider numbers so that... [he could] bill for procedures as quickly as possible";

(g) That the two other orthopedic groups that the Hospital represented would be leaving the Hospital would indeed leave the Hospital; and/or

(h)  That the Defendants would not unreasonably limit his time in the operating room.

65.     The Defendants knew Dr. Uwaydah was entering into the Contract based in part or in whole upon a unilateral mistake of fact.  The Defendants knew or should have known that Dr. Uwaydah would believe the facts represented to him in correspondence and in the Contract itself were true.  Dr. Uwaydah mistakenly believed in the truth and accuracy of the Defendants' representations.

66.     As a result of the Defendants' Contract with Dr. Uwaydah, whom the Defendants knew was operating under a unilateral mistake of fact, Dr. Uwaydah is entitled to equitable, compensatory and other forms of relief.

## COUNT TEN
## VIOLATION OF 42 U.S.C. § 1983

67.     All averments set forth above are hereby incorporated as if fully restated herein.

68.     Defendant Hospital is a county operated and funded facility and Defendant Minick is an agent of the Hospital, who creates and implements policy for the county operated Hospital.

69.     The Defendants' discriminatory acts deprived Plaintiff of his constitutional rights, privileges and immunities.

70.     The deprivation was the result of the Defendants acting both individually and through group policymaking under color of state law.

71.    Specifically, the Defendants used the guise of peer review, credentialing, and the Hospital executive committee reviewing process to deny Plaintiff of his rights based on his Lebanese national origin.

72.    The Defendant's actions included defamatory and libelous statements, denial of access to facilities, denial of privileges, and other discriminatory acts.

73.    As a result of the Defendants' actions, Dr. Uwaydah is entitled to equitable, compensatory and other forms of relief.

### COUNT ELEVEN
### VIOLATION OF 42 USC § 2000e et seq.

74.    All averments set forth above are hereby incorporated as if fully restated herein.

75.    The Defendants' controlled Plaintiff's ability to practice medicine at Van Wert Hospital though credentialing, privileging and facility usage decisions.

76.    The Defendants unlawfully and effectively discharged Plaintiff and denied him privileges and access to facilities based upon his status as a Lebanese national.

77.    The Defendants further used this discriminatory discharge to interfere with Plaintiff's access to privileges at other institutions.

78.    As a result of the Defendants' actions, Dr. Uwaydah is entitled to equitable, compensatory and other forms of relief.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

(a) For a preliminary injunction, and temporary restraining order ("TRO") requiring Defendants, their agents, officers, employees, and successors to cease all slander, libel and defamation of Dr. Uwaydah, including any and all verbal or written communications concerning the reasons for Dr. Uwaydah's

termination of employment at VAN WERT COUNTY HOSPITAL or any activity at the Hospital;

(b) That a permanent injunction be issued prohibiting Defendants, their officers, agents, employees, and successors, from any and all slander, libel or defamation of Dr. Uwaydah, including any and all verbal or written communications concerning the reasons for Dr. Uwaydah's termination of employment at VAN WERT COUNTY HOSPITAL;

(c) A preliminary injunction and TRO, prohibiting the Defendants, their officers, agents, employees, and successors from making any further communication concerning Dr. Uwaydah, written or oral, without express approval of the Court or Plaintiff's counsel of the communication;

(d) That Plaintiff be awarded compensatory damages against Defendants in an amount to be established at trial;

(e) That Plaintiff be awarded punitive damages against Defendants in an amount to be established at trial;

(f) That the Court order Defendants to pay counsel for Plaintiff the reasonable attorney's fees and the costs and expenses of this action; and

(g) For such other and further relief as may be equitable.

Respectfully submitted,

Charles M. Murray (#0052083)
cmm@murrayandmurray.com
Patrick G. Warner (#0064604)
MURRAY & MURRAY
111 East Shoreline Drive
Post Office Box 19
Sandusky, Ohio 44871-0019
Telephone: (419) 624-3000
Facsimile: (419) 624-0707
Attorneys for Plaintiff

## **JURY DEMAND**

THE PLAINTIFF DEMANDS A TRIAL TO A JURY ON ALL ISSUES SO

TRIABLE.

DATED this _____ day of October 2000.

_____
Charles M. Murray (#0052083)
MURRAY & MURRAY